SHOWTIME/THE MOVIE CHANNEL, INC., Southeastern Cable Corporation, Sunbelt–Denntronics Cable, Ltd., Sunbelt Cable, Ltd., Sunbelt Cable Corporation, and ESPN, Inc., Plaintiffs,

v.

COVERED BRIDGE CONDOMINIUM ASSOCIATION, INC., Harold Berger, Herbert Gross, Jack Tager, Bertha Goodman, Seymour Paris, Louis Lax and Frank Steinberger, Defendants.

No. 85–8676–CIV.

United States District Court,
S.D. Florida,
West Palm Beach Division.

March 23, 1988.

Philip J. Kantor, Frates, Bienstock & Sheehe, Miami, Fla., for plaintiffs.

Sachs & Sax, Boca Raton, Fla., for defendants.

## FINAL SUMMARY JUDGMENT

ROETTGER, District Judge.

THIS CAUSE is before the Court following a hearing on plaintiffs' motion for summary judgment on liability and for a permanent injunction. Upon consideration of the arguments of counsel and the voluminous record in this action, the Court finds as follows.

Plaintiffs SOUTHEASTERN CABLE CORPORATION and SUNBELT–DENNTRONICS CABLE, LTD. are engaged in the distribution of "subscription television" in Palm Beach County, Florida, where the instant claims arose. Plaintiff SUNBELT CABLE CORPORATION owns and operates cable television systems in Palm Beach County. Plaintiff SUNBELT CABLE, LTD., is a limited partnership. SUNBELT CABLE CORPORATION is the general partner of SUNBELT CABLE LTD. Plaintiff SHOWTIME/THE MOVIE CHANNEL, INC., produces private, commercial-free, pay television entertainment services, called "Showtime" and "The Movie Channel," consisting of movies and special events some of which are copyrighted under the Copyright Laws of the United States. These nationwide services are delivered in the United States by means of satellite transmissions or "feeds." Plaintiff SHOWTIME contracts with subscription television operators, including plaintiff SUNBELT, to receive its satellite feeds and to distribute its services to the local operator's customers.

Plaintiff ESPN, INC. produces a private, television entertainment service consisting primarily of sports programming. This nationwide service is also delivered by means of satellite transmissions. ESPN contracts with subscription television operators to receive and distribute its satellite feeds as part of their service. The subscription television operators, including plaintiff SUNBELT, pay a subscription fee for the right to include the service in their cable, master antenna and microwave transmissions.

Defendant, COVERED BRIDGE CONDOMINIUM ASSOCIATION, INC., is a Florida non-profit corporation that governs and operates 960 dwelling units comprising

19 separate condominiums known collectively as "Covered Bridge Condominium." The individual defendants composed the 1984–1985 Board of Directors of COVERED BRIDGE CONDOMINIUM ASSOCIATION.

Defendant, COVERED BRIDGE CONDOMINIUM ASSOCIATION, INC., had a contract for services with Plaintiff, SUNBELT, until early in 1985. Defendant discontinued the contract with SUNBELT early in 1985 and refused to obtain authorization for the receipt of SUNBELT'S services or to make any payments for programming. Plaintiff alleges in the amended complaint filed on September 8, 1986 that Defendant has intercepted and appropriated to its own use Plaintiffs' satellite cable programming through the use of a satellite reception dish antenna that the condominium association installed on its premises. The condominium association distributes the programming to all unit owners at the Covered Bridge Condominium.

Defendant, COVERED BRIDGE CONDOMINIUM ASSOCIATION, INC., does not deny that it received Plaintiffs' satellite programming without authorization or that it used the programming for its own benefit and the benefit of the 960 condominium unit owners. Defendant was advised by Plaintiffs that their activities were unauthorized and that they should immediately cease and desist. Defendant, COVERED BRIDGE CONDOMINIUM ASSOCIATION, persisted in its conduct and the instant suit ensued.

Plaintiffs seek relief pursuant to the following provisions: the Federal Communications Act of 1934, 47 U.S.C. § 705; the Lanham Act, 15 U.S.C. §§ 1051–1125; and Florida statutory and common law. Plaintiffs' motion for preliminary injunction requests that this Court enjoin defendants continued unauthorized interception of plaintiffs' programming services. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1338. In addition, this Court has pendent jurisdiction over the state law cliams because the state claims share a common nucleus of operative facts with the federal claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

## STANDING

Prior to proceeding to the major issues in this case, the Court must consider whether plaintiffs have standing to pursue this action. Section 605(d)(3)(A) provides a private right of action for "any person aggrieved by any violation of subsection (a) of this section."

Defendant, COVERED BRIDGE CONDOMINIUM ASSOCIATION, INC., argues in their motion to dismiss[1] and in their memorandum in opposition to summary judgment that plaintiff SUNBELT has no standing to pursue the relief requested in the instant case. Defendant contends that SUNBELT does not initiate or participate in any way in the transmission of the signals it complains defendants are receiving and that SUNBELT has no ownership interests in the programming services. Defendant argues that, therefore, SUNBELT has no standing to claim violations under § 705 of the Communications Act.

There is a division of authority as to whether a cable company, who is not the sender or originator of the intercepted communications, has standing to sue under § 605(d) for alleged violations of § 605(a).

Defendants cite three cases for the proposition that SUNBELT lacks standing in the case at bar. First, defendant cites *Goldstein v. United States,* 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942) and *Reitmeister v. Reitmeister,* 162 F.2d 691 (2d Cir.1947). Defendant argues that these cases indicate that the Communications Act is intended to protect only the sender of a communication and not all persons or entities with some cognizable interest in its substance. As is noted by plaintiff, however, these two cases, which are factually distinguishable from the case before the

1. The motion to dismiss filed by defendants was denied by order of this Court on September 5, 1986.

Court, were decided years before the advent of the technology involved herein. In addition, these two cases were decided prior to the enactment of the amendments that provide for a private right of action under 605(a). This Court finds that the first two cases cited by defendant have little precedential bearing on the case at bar.

Defendant also relies upon *Air Capital Cablevision, Inc. v. Starlink Communications Group, Inc.*, 601 F.Supp. 1568 (D.Kansas 1985) and the legislative history of § 605(d) contained therein in support of their argument that plaintiff SUNBELT lacks standing to pursue this action. The *Starlink* decision has, however, been soundly criticized for its failure to follow the standard standing analysis. *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 650 F.Supp. 838 (D.Mass.1986). In addition, the *Starlink* case is factually dissimilar from the case at bar. In the *Starlink* case, the defendant was a seller and distributor of satellite dish antennae, not one allegedly utilizing a dish to receive satellite cable programming without authorization.

Plaintiff SUNBELT relies principally upon *American Television and Communications Corporation v. Floken, Ltd.*, 629 F.Supp. 1462 (M.D.Fla.1986) and the legislative history of § 605(d) contained therein to support their position that standing exists in the instant case. In the *Floken* case, the standing issue was squarely addressed and decided in favor of the plaintiff cable company. The Court in *Floken* properly considered constitutional and prudential limitations on standing and ruled that the plaintiff cable company was an "aggrieved party" within the meaning of § 605(d) and that, therefore, the plaintiff cable company had standing.

The United States Court of Appeals for the Eighth Circuit recently considered the standing issue in *Sioux Falls Cable Television v. State of South Dakota, et al.*, 838 F.2d 249 (8th Cir.1988). The Eighth Circuit determined that the cable company had "shown that they have personally suffered some actual or threatened injury, resulting from or fairly traceable to the [defendant's] alleged illegal action, which is likely to be redressed by the injunctive relief they seek." *Id.* The Eighth Circuit Court of Appeals also concluded that the plaintiff cable company had "standing under any articulation of the prudential standing requirements." *Id.* Accordingly, the Court in *Sioux Falls Cable* held that the plaintiff cable company, who was not the sender or originator of the intercepted communications, had standing to pursue the action.

This Court finds the reasoning of the *Floken* and the *Sioux Falls Cable* cases persuasive. As in those cases, the plaintiff cable company in the case at bar has alleged that it pays for the right to receive and distribute cable programming in the area at issue and thus has a significant proprietary interest in the satellite signals. In addition, as in *Floken* and *Sioux Falls Cable*, plaintiff SUNBELT has alleged that the actions of defendants in the case at bar have deprived SUNBELT of potential customers and fees. This Court finds, therefore, that plaintiff SUNBELT has satisfied both the constitutional and the prudential limitations on standing in the case before the Court.[2]

Defendant, COVERED BRIDGE CONDOMINIUM ASSOCIATION, INC., acknowledges that plaintiffs SHOWTIME/THE MOVIE CHANNEL and ESPN are "senders" that transmit the satellite signals that can be received by defendants' equipment and that, therefore, these two plaintiffs clearly have standing. Defendant argues, however, that SHOWTIME/THE MOVIE CHANNEL has now scrambled their transmissions, making their unauthorized interception technically impossible and rendering their claim for injunctive relief moot. Defendant also argues that with respect to ESPN, defendants are willing to stipulate that they will

---

2. *See, e.g., Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Valley Forge Christian College v. Americans United for Separation of Church &* *State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed. 2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

refrain from using their equipment to intercept ESPN's unscrambled transmissions during the pendency of the litigation and that, therefore, ESPN's request for injunctive relief is also moot.

This Court notes, however, that "it is well-settled that, in a suit for injunctive relief, the voluntary cessation of allegedly illegal practices in an attempt to avoid suit does not moot the controversy they present." *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1387–88 (5th Cir. 1980) (citations omitted). Although a case may be moot if the defendant "can demonstrate that there is no reasonable expectation that the wrong will be repeated", defendants have made no such showing in the case at bar. *See, e.g., United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Accordingly, this Court finds that the claims of plaintiff SHOWTIME/THE MOVIE CHANNEL and plaintiff ESPN are not moot and are, therefore, properly before the Court.

## THE FEDERAL COMMUNICATIONS ACT

In Count I of their complaint, plaintiffs allege that defendants have violated the Federal Communications Act of 1934, 47 U.S.C. § 705(a).[3] Section 705(a) of the Federal Communications Act provides in pertinent part as follows:

[no] person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication [or any information therein contained] for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence. contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. 47 U.S.C. § 605(a).

Due to the fact that the satellite transmissions embodying the audiovisual works of plaintiffs in this action are intended to be used only by those authorized through payment of a subscription fee, the transmissions are protected communications under 47 U.S.C. § 705(a).

Defendants argue, however, that the use of their satellite reception equipment falls within the "private viewing" exception to the general prohibition against such unauthorized reception and transmission. The system used in this case is is privately owned by the condominium. The system is used only to receive unscrambled satellite cable programs for private viewing in the individual dwelling units in the condominium community. No display in "public areas" of the complex is involved. Defendants contend, therefore, that their use of the satellite equipment is precisely within the factual circumstances described or implied in the legislative history as within the § 705(b) exemption.

Section 705(b) provides as follows:

The provisions of subsection (a) of this ection shall not apply to the interception or receipt by any individual, or the assisting (including the manufacture or sale) of such interception or receipt, of any satellite cable programming for private viewing if—

(1) the programming is not encrypted; and

(2)(A) a marketing system is not established under which—

(i) an agent or agents have been lawfully designated for the purpose of authorizing private viewing by individuals, and

---

**3.** Plaintiffs refer to section 705 of the Federal Communications Act as 47 U.S.C. § 705. The Comprehensive Cable Communications Policy Act of 1984, P.L. No. 98–549 ("1984 Cable Act") amended substantially former § 605 of the Federal Communications Act. Although the 1984 Cable Act redesignates § 605 as § 705 of the Federal Communications Act, the amendments are codified at 47 U.S.C. § 605.

(ii) such authorization is available to the individual involved from the appropriate agent or agents; or

(B) a marketing system described in subparagraph (A) is established and the individuals receiving such programming has obtained authorization for private viewing under that system. 47 U.S.C. § 605(b)

Numerous courts have considered the "private viewing" exception to the prohibition against unauthorized reception and transmission that is provided by § 605(b). A number of cases have considered the use of satellite equipment to receive and display sports programming to paying customers at restaurants and bars.[4] These cases have uniformly held that the requirements of the "private viewing" exception were not fulfilled. Other courts have considered the commercial use of satellite reception equipment to distribute premium television services to the rooms of paying hotel and motel guests.[5] These courts have also held that such use of satellite equipment was not within the limited and strictly conditioned exception to the broad prohibitions of § 605(a).

Plaintiffs rely primarily upon *American Television and Communications Corp. v. Floken, Ltd.* and *Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel, Inc.* in support of their position that defendants' use of the satellite equipment at issue in this case violates section 605(a) and is not within the exception provided by section 605(b). Defendants rely primarily upon the case of *AirCapital Cablevision, Inc. v. Starlink Communications Group, Inc.*, 601 F.Supp. 1568 (D.Kansas 1985) in support of their argument that the non-commercial reception of satellite transmissions for private viewing does not and never has violated § 705(a), or its predecessor, § 605.

These cases are, however, readily distinguishable from the case before the Court. As was previously noted by the Court, the *Starlink* case is factually dissimilar from the case at bar. In the *Starlink* case, the defendant was a seller and distributor of satellite dish antennae, not one allegedly utilizing a dish to receive satellite cable programming without authorization, as are defendants in the case at bar. The court in *Starlink* noted that "the 1984 amendments to the Communications Act of 1934 were enacted specifically to protect enterprises such as that in which [defendant in that action] is engaged." 601 F.Supp. 1570.

The *Floken* and *Edinburg* cases are also readily distinguishable from the case at bar. These cases concern the "use of satellite dishes to provide satellite cable programming for ... hotel/motel guests without payment of subscription fees, and for their own commercial advantage." 629 F.Supp. at 1469.

In the instant case, however, defendants are a condominium association and its board of directors. Defendants have utilized the satellite equipment in this case to provide for the reception of satellite programming for viewing by the occupants of individual condominium units. The case before the Court is, therefore, a case of first impression.

Accordingly, this Court must examine the statutory language and the legislative history of the statute to determine whether Congress intended that the "private viewing" exception contained in § 605(b) apply to the facts of the case before this Court.

Section 605(b) requires that the viewing be by an individual in his private dwelling unit. In addition, section 605(b) requires that the equipment be owned or operated by said individual. Finally, the exception contained in § 605(b) requires that the programming not be encrypted and that no

---

**4.** *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 650 F.Supp. 838 (D.Mass.1986); *NFL v. Cousin Hugo's, Inc.,* 600 F.Supp. 84 (E.D.Missouri 1984); *NFL v. The Alley, Inc.,* 624 F.Supp. 6 (S.D.Fla. 1983).

**5.** *American Television and Communications Corp. v. Floken, Ltd.,* 629 F.Supp. 1462 (M.D.Fla. 1986); *ESPN v. Edinburg Community Hotel, Inc.,* 623 F.Supp. 647, 649 (S.D.Texas 1985); *Rainbow Programming Services, Inc. v. Patal,* Case No. PCA 82–6009 (N.D.Fla. January 18, 1982).

marketing system has been established for the authorization of private viewing.

Section 605(c)(4) defines private viewing as "the viewing for private use in an individual's dwelling unit by means of equipment, owned or operated by such individual, capable of receiving satellite cable programming directly from a satellite." 47 U.S.C. § 605(c)(4). The legislative history of the 1984 amendments provides in pertinent part as follows:

> The term "private viewing" is intended to describe a situation whereby an individual purchases or otherwise acquires satellite receiving equipment to receive satellite cable programming which he views within his private dwelling place. The "individual's dwelling place" is a place where persons present are within the normal circle of a family or its social acquaintances.
>
> 130 Cong.Rec.S. 14288 (October 11, 1984).

In describing factual situations that would not be authorized under § 605(b), Congress has provided that

> No retransmission, public performance or display for direct or indirect commercial advantage is contemplated to be "private viewing."
>
> Thus, it is not intended that "private viewing" include any retransmission by so-called "private cable" or "satellite master antenna television" systems. Nor is it contemplated that an individual may redistribute programming received by his satellite equipment to the homes or residences of his neighbors. Nor is it contemplated that "private viewing" includes display of satellite programming in the public area of an apartment building, condominium or housing complex.
>
> 130 Cong.Rec. S 14288 (October 11, 1984).

In addition, the Senate Report regarding this statute states that

> an individual's dwelling unit includes a vacation home, an individual's mobile home unit (but not a mobile home park),

an individual's recreational motor home vehicle or a boat which is designed with sleeping accommodations for no more than a few people.

> 1984 U.S.Code Cong. & Admin.News at 4741.

Defendants argue that their use of their satellite reception equipment is precisely within the factual circumstances described or implied in the legislative history as within § 605(b) authorization.

A review of this legislative history indicates to this Court, however, that Congress did not intend to exclude from the prohibition of § 605(a) groups of individuals who receive satellite programming from a single satellite dish. This Court is of the opinion that Congress, in enacting § 605(b), was concerned with protecting the individual owners of backyard earth stations and their supplier. Congress acted in the 1984 amendments in order to enable home viewer access to video signals in areas where no marketing systems have been established. The situation in the case at bar is certainly more akin to a mobile home park in which one satellite dish provides programming to numerous mobile homes than it is to such an individual backyard station.[5a] Accordingly, this Court concludes that the system at issue in this case does not fulfill the § 605(b) requirement that the programming be viewed only in the "individual's dwelling place."

Even assuming that a single condominium building may be considered an "individual" under the Communications Act, defendant, COVERED BRIDGE CONDOMINIUM, is actually composed of nineteen separate condominium buildings—comprising 960 individual dwelling units—which are all governed by defendant. The legislative history to the private viewing amendment explicitly provides that it is not "contemplated that an individual may redistribute programming received by his satellite equipment to the homes or residences of his neighbors." 130 Cong.Rec. S 14288 (October 11, 1984). Thus, once the plain-

---

**5a.** The Court can notice that most, if not all, mobile homes in mobile home parks in this area are owned by individuals, thereby being similar

—at least as to the dwelling unit—to individual condominium dwellers.

tiffs' signals are distributed from one condominium unit or building to a second condominium unit or building at defendant COVERED BRIDGE, the defendants' activity cannot factually be seen to fall within the exemption to liability provided for by § 605(b).

In addition, this Court finds that defendant is operating a classic "satellite master antenna television" system. Congress has defined a SMAT system as "a private cable system serv[ing] only residential apartment, cooperative, condominium or other multiple unit dwelling complexes." Report of the Senate Committee on Commerce, Science and Transportation on S66, Report No. 98–67, 98th Congress 1st Session, at 19 (1983).[6] The legislative history of the Communications Act clearly provides that "private viewing" is not intended to "include any retransmission by so-called 'private cable' or 'satellite master antenna television' systems."

This Court is aware that the Eighth Circuit Court of Appeals recently determined that the State's interception and retransmission of satellite signals to the individual cells of inmates at the state penitentiary was within the "private viewing" exception of the Communications Act. *Sioux Falls Cable Television v. State of South Dakota,* et al., 838 F.2d 249 (8th Cir.1988).[7]

The Eighth Circuit Court of Appeals stated in the *Sioux Falls Cable* case, however, "that the situation at the penitentiary is exceptional and calls for a reading of the statute narrowly tailored to [the] facts." *Id.* at 254. The majority in the *Sioux Falls Cable* case were concerned with internal problems at the penitentiary and the fact that it simply was not feasible to set up an individual payment scheme for the use of the cable service at the penitentiary. The Eighth Circuit concluding in the *Sioux Falls Cable* case, therefore, that "in the unique circumstances" of that case, the

requirements of the "private viewing" exception were fulfilled.

The instant case is readily distinguishable from the situation considered by the Eighth Circuit Court of Appeals in the *Sioux Falls Cable* case. The Court in the *Sioux Falls* case noted that "the penitentiary setting is … a limitation on the availability of authorization 'to the individual involved from the appropriate agent or agents' under Section 605(b)(2)(A)(ii)." Unlike the situation before the court in the *Sioux Falls Cable* case, in the instant case it is not inconvenient, impractical, costly, or most importantly, legally impossible for the individual unit owners to subscribe to cable. The Court in *Sioux Falls* also found that the state had come as close as was possible under the circumstances to implementing a conventional "private viewing" system. In the case before this Court, no such finding is warranted.

■ In addition, even assuming, *arguendo,* that the activities of defendant are within the general language of the § 605(b) exemption from liability, the provisions of § 605(b)(1) and § 605(b)(2)(A) are not satisfied. As to plaintiff SHOWTIME, the Court notes that their signals are now encrypted and that, therefore, the § 705(b) exemption does not apply to the interception of their signals.

■ Additionally, this Court concludes that even if defendants' use of their system is authorized by § 605(b), that authorization has been lost because the programmers in the case at bar have established "marketing systems" for their signals. Plaintiff, SHOWTIME/THE MOVIE CHANNEL, INC., has a marketing system in place for SMATV systems servicing multiple-unit dwellings, such as condominium complexes.[8] It is undisputed that plaintiffs stand ready and willing to market their signals to defendants. Indeed, prior to the installation of the private satellite system

---

6. Defendant has submitted a different definition of a satellite master antenna television system in its memorandum in opposition to summary judgment. This Court finds, however, that the congressional definition is controlling.

7. The *Sioux Falls* decision is reported at 838 F.2d 249 (8th Cir.1988).

8. *See,* answers to interrogatories by plaintiffs, filed in support of summary judgment.

by defendants, defendant COVERED BRIDGE CONDOMINIUM contracted with plaintiff SUNBELT to receive cable for all the condominium units at COVERED BRIDGE. In addition, some individuals at COVERED BRIDGE contracted personally with SUNBELT to receive premium channels.[9]

Defendant COVERED BRIDGE CONDOMINIUM argues that if plaintiffs are successful in the instant case, defendants will be prohibited from "using their equipment for any purpose", will be required to "abandon their equipment" and enter into a "contract of adhesion with SUNBELT as a precondition to the reception of *any* satellite program service ..."[10] The Court notes, however, that SUNBELT does not have an exclusive franchise to operate a cable television system in West Palm Beach. Accordingly, defendants may contract with other cable television systems; they will not be required to either contract with plaintiff or abandon their equipment.

In conclusion, this Court finds that the activities of defendants in the case at bar do not fall within the "private viewing" exemption to liability provided by § 605(b). The system at issue in this case does not fulfill the § 605(b) requirement that the programming be viewed only in the "individual's dwelling place." In addition, defendants' whole scale cable operation that services 960 separate dwellings is a classic "satellite master antenna television" system and is, therefore, expressly excluded from § 605(b) by the legislative history of the Communications Act. Finally, even assuming that the activities of defendants satisfy the general requirements of § 605(b), the provisions of § 605(b)(1) and § 605(b)(2)(A) have not been fulfilled.

9. *See,* deposition of Herbert Gross at 8–12.

10. *See,* defendants' memorandum in opposition to plaintiffs' motion for summary judgment at 2–3.

11. 15 U.S.C. § 1114 provides in pertinent part as follows:
   (1) Any person who shall, without the consent of the registrant

## TRADEMARK AND LANHAM ACT

In addition to their Communications Act claims, plaintiffs allege that defendants have infringed plaintiffs' trademarks in violation of 15 U.S.C. § 1114 and that defendants have engaged in unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

Specifically, in Count II of their complaint, plaintiffs allege that defendants by their acts, have infringed the trademarks and trade names of plaintiffs, the trademark registrants. Plaintiffs further allege that defendants' acts of appropriating the services, trademarks and trade names of plaintiffs in connection with the exhibition and distribution of SHOWTIME and ESPN's services at the condominium is likely to, and intended to cause confusion, mistake, and deception. Accordingly, plaintiffs allege in Count II of the complaint, that defendants have committed trademark infringement in violation of 15 U.S.C. § 1114.[11]

In Count III of plaintiffs' complaint, plaintiffs allege that defendants have engaged in unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs allege that defendants have violated the Lanham Act by falsely describing and representing, directly or by implication, that the plaintiffs' entertainment programming services, Showtime, The Movie Channel and ESPN, were paid for and lawfully obtained from either SHOWTIME, ESPN, or SUNBELT. Plaintiffs further allege in Count III, that defendants violated the Lanham Act by intentionally, knowingly and willfully misdescribing and misrepresenting plaintiffs' services by describing and representing that defendants were, and COVERED BRIDGE continues to be, au-

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;
shall be liable.

thorized receivers and providers of plaintiffs' programming services.[12]

As was noted by the Eleventh Circuit Court of Appeals in *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir.1983), "in order to prevail on a trademark infringement claim, the registrant must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive." *Id.* at 1491. In determining whether a trademark has been infringed, the courts utilize a "likelihood of confusion test," that is, whether defendant's use of a mark in connection with the sale of goods or services is likely to confuse consumers.[13] In *Sun Bank of Fla. Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311 (5th Cir.1981), the Fifth Circuit Court of Appeals identified several factors for courts to consider in determining whether there is a likelihood of confusion. These factors are as follows:

type of service mark, similarity of design, similarity of service, identity of service facilities and customers, similarity of advertising media used, defendant's intent and actual confusion. *Id.* at 314.

An examination of these factors with respect to the instant case indicates that defendants' use of plaintiffs' marks in this case is likely to confuse consumers. Defendants in the case at bar are not merely using marks similar to those of plaintiffs, defendants are using the exact marks registered to plaintiffs. In addition, as was noted by the court in *Burger King*, "it is well established that 'falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement.'" *Id.* at 1492. Further, "the law is established that falsely suggesting the existence of affiliation with a well-known business by usurping the latter's goodwill constitutes both trademark infringement and unfair competition." *Volkswagenwerk Aktiengesellschaft v. Tatum*, 344 F.Supp. 235, 237 (S.D.Fla.1972). This is precisely the situation presented by the case before the court.

A similar situation was considered by the court in *Home Box Office, Inc. v. Corinth Motel, Inc.*, 647 F.Supp. 1186 (N.D.Miss. 1986). The court in *Corinth* determined that in that case "defendant's display of HBO and Showtime programming did not amount to an infringement of plaintiffs' trademarks." *Id.* at 1192. The court in *Corinth* noted that "HBO and Showtime have absolute control over the quality of their programming viewed at defendant's motel. There is, therefore, no risk to the consumer that the programs would be 'something less' than what consumers would or should expect." *Corinth* at 1192.

In the case at bar, however, as is noted by plaintiffs in their reply memorandum, although plaintiffs, SHOWTIME and ESPN, might have absolute control over the contents of their programming, they and the other program suppliers do not have absolute control over the quality of their signals as received by dish owners.[14] This case is, therefore, readily distinguishable from the situation considered by the court in *Corinth*.

---

12. 15 U.S.C. § 1125 provides in pertinent part as follows:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

13. *See, Burger King Corp. v. Mason*, 710 F.2d 1480, 1491–92 (11th Cir.1983); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir.1980); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 500 (5th Cir. 1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979).

14. *See,* deposition of Dennis Chambers at 70–71 wherein he states: "When Showtime is carried in a snowy manner and service is not good ... Showtime is said by a unit owner that, 'the signals not good' ... and that is reflected on other people in our customer base ...."

With respect to plaintiffs' claim of unfair competition, this Court notes that 15 U.S.C. § 1125(a) is designed to protect against a broader range of deceptive or unfair trade practices than is 15 U.S.C. § 1114. In addition, both sections require the same test to determine whether the particular actions complained of are violative of their terms. *See, Home Box Office, Inc. v. Corinth, supra,* at 1192; *Kentucky Fried Chicken v. Diversified Packaging,* 549 F.2d 368, 386 (5th Cir.1977); *Smithkline Beckman Corp. v. Pennex Products Co.,* 605 F.Supp. 746, 749 (E.D.Pa.1985).

Accordingly, this Court concludes that as a matter of law, plaintiffs are entitled to a judgment of liability against defendants on both their claim for trademark infringement and their claim for unfair competition. As was noted by the court in *Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel,* 623 F.Supp. 647 (S.D.Texas 1985), "defendant has violated 15 U.S.C. § 1125(a) by falsely inferring and describing that the entertainment programming services of the plaintiffs ... were paid for and lawfully obtained, that the defendant was authorized to receive and provide plaintiffs' services to their own customers, and that the defendant was authorized by [plaintiffs] to receive tangible and intangible benefits from [the ultimate consumers]. Consequently, defendant has unfairly competed with plaintiffs ..." *Id.* at 655.[15]

### STATE LAW CLAIMS

Since plaintiffs have met their burden of demonstrating the defendants' violations of the federal laws at issue in this case, it is not necessary for this court to consider the pendent state law claims asserted by plaintiffs.

### THE COUNTERCLAIM

On October 15, 1986, defendants in this action filed a counterclaim and third party complaint wherein defendants allege that the third-party defendants have violated §§ 1 and 2 of the Sherman Act, the Florida Deceptive and Unfair Trade Practices Act

and have committed conversion in violation of Florida law. Counter-defendants have filed a motion to dismiss said counterclaim and a motion to strike the counterclaim.

In accordance with the foregoing finding of liability in favor of plaintiffs in this action and following a review of the counterclaim and third party complaint filed by defendants, the pleading filed by defendants is hereby STRICKEN.

IT IS THEREFORE ORDERED AND ADJUDGED

That Plaintiffs' motion for summary judgment on the issue of liability is hereby GRANTED with respect to Plaintiffs claims made pursuant to 47 U.S.C. § 605 (Federal Communications Act of 1934); 15 U.S.C. § 1114 (trademark infringement); and 15 U.S.C. § 1125(a) (unfair competition).

FURTHER ORDERED that a permanent injunction is hereby entered restraining defendant COVERED BRIDGE and its partners, subsidiaries, affiliates, officers, agents, representatives, servants, employees, attorneys, privies and all persons in active concert and participation with it from:

(a) Intercepting, receiving, appropriating, converting to its own use, or retransmitting, divulging or using any satellite-delivered transmissions of Plaintiffs' programming or signals, or any satellite-delivered programming which Plaintiff SUNBELT makes available to the public through its master contracts, without authorization from Plaintiffs;

(b) Assisting, aiding, abetting or conspiring with any person to intercept, receive, appropriate, convert or retransmit, divulge or use Plaintiffs' programming or signals, without their authorization;

(c) Assisting, aiding, abetting or conspiring to use the trademarks or trade names of Plaintiffs, SHOWTIME and ESPN, without their authorization; and

(d) Destroying, transferring or concealing any records, resident lists, sales receipts, documents, memoranda, program di-

15. The *Edinburg* case is a consent decree and has, therefore, limited precedential value.

rectories, invoices, purchase orders, bank records, books or ledgers, diagrams, advertisements, or equipment used in or pertaining to the purchase, lease, design, construction, repair, installation, operation, or use of any equipment designed, adapted, used, capable of or intended for use in either intercepting, receiving, appropriating or retransmitting satellite transmissions of programming owned or used by Plaintiffs during the pendency of this action and the time frame alleged herein.