UNITED STATES of America,
Plaintiff–Appellee,

v.

Bennie Dean HERRING, Billy Clyde
Herring, Ronald Mills, and Dee Dee
Bell, Defendants–Appellants.

No. 90–7280.

United States Court of Appeals,
Eleventh Circuit.

June 17, 1991.

W. Terry Travis, George Beck, Dennis R. Pierson, Montgomery, Ala., for defendants-appellants.

James E. Wilson, U.S. Atty., Charles R. Niven, Asst. U.S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before ANDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

CLARK, Circuit Judge:

Appellants Bennie Dean Herring, Billy Clyde Herring, Ronald Mills, and Dee Dee Bell were convicted for their complicity in a conspiracy to sell a device (known as a VideoCipherII or VCII) that when modified descrambles satellite pay-television transmissions. Informants and undercover agents of the United States Customs Service entered Tri–State Satellites in Brundidge, Alabama, in December of 1987 and recorded various transactions in which several appellants indicated that they modified the VCII's so that the devices would descramble satellite pay-television signals. The Customs Service raided the store on December 23, 1987, and removed as evidence several VCII's that had been modified. A different informant contacted appellant Dee Dee Bell in June 1988 about purchasing descrambling equipment. As a result of their conversation, the informant traveled to Ariton, Alabama, where he purchased a modified descrambler from Billy Clyde Herring.

Appellants were indicted on October 17, 1989 for conspiracy and for substantive violations of a provision of the federal Wiretap Law, 18 U.S.C. § 2512(1)(b). The jury convicted appellants Bennie Dean Her-

ring, Billy Clyde Herring, and Ronald Mills of both conspiracy and substantive counts. Dee Dee Bell was found not guilty on the single substantive count charged to her but was found guilty on the conspiracy count. Bennie Dean Herring was sentenced to six months of home detention, probation for five years, and to pay a fine of $5,000 and a special assessment of $150. Billy Clyde Herring was sentenced to four months of home detention, probation for three years, and to pay a fine of $1,000 and a special assessment of $150. Ronald Mills was sentenced to three months of home detention and probation for three years. Dee Dee Bell was placed on probation for one year.

This case raises a novel question of statutory interpretation in this circuit. The question is whether the appellants were convicted under the correct statute. Only one circuit court to date has held that the Wiretap Law prohibits the conduct for which appellants were convicted.[1] However, a second statute, 47 U.S.C. § 605, had been held to prohibit the specific acts appellants committed long before appellants were indicted.[2] Because we cannot with confidence conclude that the Wiretap Law sanctioned appellants' conduct, we reverse appellants' convictions.

## I. SECTION 2512(1)(b) OF THE WIRETAP LAW

Section 2512(1)(b) of the Wiretap Law states:

[A]ny person who *intentionally* ... manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, *or electronic* communications ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.[3]

The Wiretap Law was completely overhauled in 1986, and we must decide whether the 1986 amendments to the section (highlighted above) made appellants amenable to conviction under its terms.

### A. The Pre–1986 Wiretap Law

■ Prior to its amendment in 1986, it is clear that this statute would not have been applicable to appellants. The legislative history shows that the statute prohibits "a relatively narrow category of devices whose principal use is likely to be for wiretapping or eavesdropping.... To be prohibited, the device would also have to possess attributes that give predominance to the surreptitious character of its use, such as the spike in the case of the spike mike or the disguised shape in the case of the martini olive transmitter...."[4]

A particularly relevant case is *United*

1. *United States v. McNutt,* 908 F.2d 561, 564–65 (10th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991).

2. *See United States v. Stone,* 546 F.Supp. 234, 239 (S.D.Tex.1982) (applying criminal provisions of section 605 against sellers of devices that intercepted microwave pay-television transmissions); *United States v. Westbrook,* 502 F.Supp. 588, 592 (E.D.Mich.1980) (same); *see also ON/TV of Chicago v. Julien,* 763 F.2d 839, 843 (7th Cir.1985) (those who manufacture and/or sell unauthorized subscription television descramblers are liable under civil provisions of section 605); *National Subscription Television v. S & H TV,* 644 F.2d 820, 826 (9th Cir.1981) (same); *Storer Communications, Inc. v. Mogel,* 625 F.Supp. 1194, 1200 (S.D.Fla.1985) (same); *Cox Cable Cleveland Area, Inc. v. King,* 582 F.Supp. 376, 380 (N.D. Ohio 1983) (same); *American Television & Communications Corp. v. Western Techtronics, Inc.,* 529 F.Supp. 617, 620

(D.Colo.1982) (same); *Home Box Office, Inc. v. Advanced Consumer Technology, Movie Antenna, Inc.,* 549 F.Supp. 14, 25 (S.D.N.Y.1981) (same). *See generally Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 640 F.Supp. 1159, 1161 (D.Mass.1986) (granting temporary restraining order under section 605 against interception of satellite pay-television transmissions); *American Television & Communications Corp. v. Floken, Ltd.,* 629 F.Supp. 1462, 1473 (M.D.Fla.1986) (granting preliminary injunction under section 605 against interception of satellite pay-television transmissions); *National Football League v. The Alley, Inc.,* 624 F.Supp. 6, 9–10 (S.D.Fla. 1983) (granting injunction under section 605 against interception of "blacked out" satellite television transmissions).

3. 18 U.S.C. § 2512(1)(b) (emphasis added).

4. 1968 U.S.Code Cong. & Admin.News 2112, 2183–84.

*States v. Schweihs,*[5] which reversed a conviction under section 2512(1)(b). In *Schweihs,* the defendant had made an amplifier that apparently assisted him in avoiding detection by the alarm system of the Wells Fargo office he was attempting to burglarize. The court held,

> The amplifier here, unlike martini olive transmitters and spike mikes, reveals no design characteristics which suggest surreptitious listening as its primary function. Indeed, on cross-examination both Government witnesses stated that Schweihs' device is basically an ordinary amplifier, that it can be used in conjunction with radios, phonographs, and other audio equipment, and that it is *not* primarily useful for the purpose of surreptitious interception of oral or wire communications.[6]

The *Schweihs* court discussed the legislative history of section 2512(1)(b): "[E]ven though a device is constructed or purchased specifically for use in covert wiretapping or eavesdropping ... it is not proscribed by the statute if its design characteristics do not render it *primarily* useful for that purpose."[7] *Schweihs* also holds, "This statutory language reflects a careful and studied congressional decision to leave untouched the production, distribution, and possession of electronic equipment designed for regular use in varied nonsurreptitious activities, even though the equipment is capable of being used in a surreptitious manner...."[8] *Schweihs* thus limited the applicability of section 2512(1)(b) to devices whose design showed that they had few if any legal purposes.[9] A device that had a significant legitimate use but whose owner used it illegitimately was not prohibited.

The descramblers involved here have no specifically surreptitious characteristics—the problem with them is that their design ·is *identical to* descramblers that are legitimate. This identity in design characteristics to company-provided descramblers is what makes appellants' descramblers useful in the first place. Indeed, the government's electronics expert testified that the software built into the descramblers was seventy-five percent identical to that in authorized descrambler units.[10] There was also evidence showing that the descramblers were necessary to receive satellite transmissions that were scrambled but required no authorization for their use.[11] These "soft scrambled" signals constitute ninety percent of satellite television signals, and it is not illegal to intercept them.[12] Because the design of the descramblers gives them significant nonsurreptitious and legitimate uses, and therefore the descramblers are not primarily useful for surreptitious listening, there is no possibility that appellants could have been convicted under section 2512(1)(b) prior to 1986.

## B. *The 1986 Amendments*

The next question is whether the 1986 amendments changed the nature of the statute. The amendments simply changed "willfully" to "intentionally" and added the phrase "or electronic" to the section.[13] Appellants' actions were intentional and satellite pay-television transmissions are "electronic communications."

Congress stated in the legislative history of the amendments, known as the "Electronic Communications Privacy Act of 1986," that the "bill amends the 1968 law to update and clarify Federal privacy protections and standards in light of dramatic

5. 569 F.2d 965 (5th Cir.1978).

6. *Id.* at 969 (emphasis in original; footnote omitted).

7. *Id.* at 968 (emphasis in original).

8. *Id.*

9. *See also* 1968 U.S.Code Cong. & Admin.News at 2183 ("A device will not escape the prohibition merely because it may have innocent uses.

The crucial test is whether the design of the device renders it *primarily* useful for *surreptitious* listening." (emphasis in original)).

10. R9–166.

11. R9–180–83 (prosecution witness).

12. R10–223–25 (defense witness).

13. *See supra* text accompanying note 3.

changes in new computer and telecommunications technologies."[14] The legislative history indicates that Congress intended to broaden the Wiretap Law to take into account new technologies. The legislative history also indicates that Congress fairly clearly intended to protect personal and business "point-to-point" communications transmitted by satellite. It does not discuss the satellite pay-television industry. It does not indicate that Congress intended to broaden the meaning of "surreptitious" to encompass devices that have legitimate uses but whose owners use them illegitimately or to broaden the definition in any other way.

The government argues that section 2512(1)(b) applies to the sale and manufacture of satellite pay-television descramblers because Congress simultaneously excepted private viewing of unencrypted satellite transmissions from the criminal provisions of the Wiretap Law.[15] However, this exception occurs in section 2511 of the Wiretap Law, which applies only to the acts of intercepting, using, or disclosing wire, oral, or electronic communications and not to the making or selling of listening devices. There is no requirement in section 2511 that the interception be surreptitious. Section 2511 is therefore much broader than section 2512(1)(b), and so it was necessary to establish an exception to its terms. The legislative history makes it clear that in formulating the exception Congress was concerned about home owners of satellite dishes who were inadvertently able to receive personal or business communications on their satellite dishes.[16]

Indeed, the legislative history of the 1986 amendments to the Wiretap Law states, "The private viewing of satellite cable programming, network feeds and certain audio subcarriers will continue to be governed exclusively by [47 U.S.C. § 605] and not by [18 U.S.C. § 2511]."[17] This statement arguably could indicate either that *only* private viewing is covered exclusively by section 605, or that private viewing *and* assisting in private viewing (the conduct involved here) is covered exclusively by section 605. We believe the better interpretation is the latter. From our reading of the legislative history, it seems that Congress simply did not consider that the manufacture and sale of satellite signal descramblers would need to be excepted from the provisions of the Wiretap Law. Section 2512(1)(b) establishes such a narrow category of prohibited devices that an explicit exception would have been superfluous.

Because Congress did not change the meaning of the word "surreptitious" in its 1986 amendments to the Wiretap Law, we believe that section 2512(1)(b) is not applicable to appellants' conduct.

## II. SECTION 605

■ During oral argument in this case, the attorney for the government contended that *only* section 2512(1)(b) proscribed the manufacture and sale of satellite descramblers at the time of the crime. However, our review of the legislative history and case law surrounding 47 U.S.C. § 605 conclusively shows that this statute governed appellants' conduct.

---

**14.** 1986 U.S.Code Cong. & Admin.News 3555, 3555.

**15.** *See* 18 U.S.C. § 2511(4)(c):
Conduct otherwise an offense under this subsection that consists of or relates to the interception of a satellite transmission that is not encrypted or scrambled and that is transmitted—
(i) to a broadcasting station for purposes of retransmission to the general public; or
(ii) as an audio subcarrier intended for redistribution to facilities open to the public, but not including data transmissions or telephone calls,
is not an offense under this subsection unless the conduct is for the purposes of direct or

indirect commercial advantage or private financial gain.
*See also id.* § 2511(5)(a)(i)(A) (subjecting private viewing of unencrypted satellite communications to civil suit by government).

**16.** *See* 1986 U.S.Code Cong. & Admin.News at 3560 ("During subcommittee consideration, Senators Laxalt, Grassley, DeConcini and Simpson expressed concerns about the bill's penalty structure for the *interception* of certain satellite transmissions by home viewers." (emphasis added)).

**17.** *Id.* at 3576.

At the time of the offense (November 1987 to June 1988), section 605 stated in part:

(a) Practices prohibited

Except as authorized by chapter 119, title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercept-ed, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

. . . .

(d) Penalties. . . .

. . . .

(2) Any person who violates subsection (a) of this section willfully and for purposes of direct or indirect commercial advantage or private financial gain shall be fined not more than $25,000 or imprisoned for not more than 1 year, or both, for the first such conviction. . . .

. . . .

(4) *The importation, manufacture, sale, or distribution of equipment by any person with the intent of its use to assist in any activity prohibited by subsection (a) of this section shall be subject to penalties and remedies under this subsection to the same extent and in the same manner as a person who has engaged in such prohibited activity.*[18]

The courts have consistently held that "entertainment programming services' satellite transmissions are radio communications within the meaning of [section 605]."[19] This interpretation is verified by

---

**18.** 47 U.S.C. § 605 (Supp. V 1987) (emphasis added).

**19.** *Home Box Office, Inc. v. Corinth Motel, Inc.,* 647 F.Supp. 1186, 1189 (N.D.Miss.1986); *see also Cable/Home Communication Corp. v. Network Prods., Inc.,* 902 F.2d 829, 848 (11th Cir. 1990) ("[S]ection 605 readily applies to proscribe pirate chips and other unauthorized decoding devices, which enable third parties to receive television satellite transmissions intended for paying subscribers." (citations omitted));

*Showtime/The Movie Channel, Inc. v. Covered Bridge Condominium Ass'n,* 693 F.Supp. 1080, 1084 (S.D.Fla.1988) ("Due to the fact that the satellite transmissions embodying the audiovisual works of plaintiffs in this action are intended to be used only by those authorized through payment of a subscription fee, the transmissions are protected communications under 47 U.S.C. § [605(a)]."), *aff'd in part, dismissed in part,* 881 F.2d 983 (11th Cir.1989), *vacated,* 895 F.2d 711 (11th Cir.1990); *Entertainment & Sports Programming Network, Inc. v. Edinburg Com-*

the legislative history of section 605. The most recent revision of section 605 prior to appellants' crimes was implemented by the "Cable Communications Policy Act of 1984." The legislative history of this revision states:

> Section 605 not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by means of new technologies. For example, existing section 605 provides protection against the unauthorized reception of subscription television (STV), multipoint distribution services (MDS), and satellite communications. This amendment ... is intended to preserve this broad reach of existing section 605....
>
> Moreover, existing section 605 is not limited to holding liable only those who, without authorization, actually receive a particular communication. *Those who "assist" (including sellers and manufacturers) in receiving such communications are similarly liable under section 605, and it is intended that this liability also remain undisturbed by this amendment.*[20]

From all of this, it is perfectly plain that section 605 prohibited the exact actions of which appellants were accused. And as we noted above, since at least 1980 courts have found that the criminal provisions of this statute apply to those who manufacture and sell subscription television signal descramblers.[21]

## III. PRINCIPLES OF STATUTORY INTERPRETATION

Section 605 manifestly prohibits appellants' conduct; it is dubious whether section 2512(1)(b) applies. We therefore turn to principles of statutory interpretation, which weigh heavily in favor of finding the indictment unartfully drawn.

■ First, ambiguous criminal statutes must be narrowly interpreted, in favor of the accused. In *Rewis v. United States,*[22] the Supreme Court voided convictions under the Travel Act of two petitioners who operated a lottery and who in doing so did not cross state lines, but whose customers did. The Court remarked that the Travel Act's legislative history was "limited"[23] and that "we are struck by what Congress did not say."[24] The opinion then discussed the absence of any congressional examination of the implications of prohibiting all crimes involving out-of-state customers. The Court concluded, "[E]ven if this lack of support [for a broad interpretation of the Travel Act] were less apparent, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."[25]

■ We are also "struck" by what Congress omitted to discuss in the legislative history of the Wiretap Law. Congress defined a large number of technologies that would be affected by the revisions to the Wiretap Law, including electronic mail, computer-to-computer communications, electronic bulletin boards, microwave, cellular telephones, cordless telephones, electronic pagers, pen registers/trap and trace

---

*munity Hotel, Inc.,* 735 F.Supp. 1334, 1338 (S.D. Tex.1986) ("The satellite transmissions embodying the audiovisual works of the Plaintiffs are protected communications under 47 U.S.C. [§ 605], because they are intended to be used only by those who use special reception equipment, and who are authorized and pay a subscription fee."); *National Football League v. The Alley, Inc.,* 624 F.Supp. 6, 9–10 (S.D.Fla.1983) ("Satellite transmissions of NFL game programs are radio communications within the meaning of Section 605 of the Federal Communications Act of 1934...." (citation omitted)); *In re Regulation of Domestic Receive-only Satellite Earth Stations,* 74 F.C.C.2d 205, 215–16 (1979) ("Section 605 ... which in relevant part prohibits the unauthorized interception and disclosure of radio communications, is applicable to domestic

U.S. satellite transmissions except those that may be designated 'broadcast for the use of the general public.'" (footnote omitted)).

**20.** 1984 U.S.Code Cong. & Admin.News 4655, 4746 (emphasis added).

**21.** *See supra* note 2.

**22.** 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

**23.** 401 U.S. at 811, 91 S.Ct. at 1059.

**24.** 401 U.S. at 811–12, 91 S.Ct. at 1059.

**25.** 401 U.S. at 812, 91 S.Ct. at 1059 (citation omitted).

devices, electronic tracking devices, and remote computer services.[26] But Congress did not include any discussion of either satellite signal descramblers or the satellite pay-television industry. The vagueness of the statutory language and legislative history, combined with the fact that devices such as those at issue would not have been covered under the terms of the pre–1986 Wiretap Law, indicate that lenity is appropriate here.

Second, "[i]t is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."[27] When the 1986 amendments to the Wiretap Law were passed, Congress knew it already had in place specific prohibitions against the precise activity at issue. In fact, Congress cross-referenced section 605 a number of times in the 1986 Wiretap Law.[28] Congress never indicated that the preceding provision was superseded. Congress had most recently amended section 605 in 1984, so its provisions were not outdated in the least. Thus, it is unlikely that in revising the Wiretap Law Congress intended to override or create an overlap with section 605.

The penalty provisions of the two laws are different in significant ways. Violations of section 2512(1)(b) can lead to imprisonment for up to five years and fines of up to $10,000. In 1988, Congress specifically increased the penalties provided under section 605. For the offense at issue, Congress raised the maximum fine from $25,000 to $50,000 and increased the maximum term of imprisonment from one year to two years. This 1988 amendment indicates two things: (1) Congress did not feel that the more severe imprisonment provisions of section 2512(1)(b) already applied to the conduct at issue; and (2) Congress intended in 1988 that the exact conduct at issue be maximally punished in terms of imprisonment less severely than section 2512(1)(b) provides. The higher fines provided for by section 605 comport well with appellants' conduct, which is primarily an economic crime—depriving the satellite pay-television companies of their revenue. The higher levels of imprisonment provided for by section 2512(1)(b) comport with its purpose of deterring the more personally invasive crime of wiretapping.

Of course, where statutes overlap, the prosecution has the right to choose the statute(s) under which the indictment will be brought. For example, in *United States v. Batchelder*,[29] the Supreme Court found that it was permissible for a prosecutor to bring suit under the more severe of two federal statutes clearly covering the same conduct. But the statutes involved here do not overlap, or even if they do, section 2512(1)(b) is so ambiguous as to require prosecution under the more specific statute.

## IV. THE *McNUTT* CASE

*United States v. McNutt*,[30] is exactly on point and holds that section 2512(1)(b) criminalizes the manufacture and sale of satellite signal descramblers. *McNutt* acknowledges the vagueness of the legislative history of section 2512(1)(b) but does not undertake an in-depth discussion of that history. *McNutt* holds, "Because the providers of pay television programming are unaware that their signals are being intercepted by cloned descramblers, such interception is surreptitious."[31]

**26.** 1986 U.S.Code Cong. & Admin.News at 3562–65.

**27.** *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976); *see also Traynor v. Turnage*, 485 U.S. 535, 547–48, 108 S.Ct. 1372, 1381, 99 L.Ed.2d 618 (1988); *Morton v. Mancari*, 417 U.S. 535, 549–50, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974).

**28.** *See, e.g.,* 18 U.S.C. §§ 2511(2)(e), (f), & (g)(iii)(II).

**29.** 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

**30.** 908 F.2d 561, 564–65 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991).

**31.** *Id.* at 565.

We believe *McNutt*'s interpretation of "surreptitious" is erroneous. *McNutt*'s definition focuses on how the descramblers are being used—so that satellite pay-television companies are "unaware" of the interception. But as discussed in section I of this opinion, the legislative and precedential history of section 2512(1)(b) clearly indicate that the *design* (as opposed to the use) of the device must make it primarily useful for surreptitious interception of communications. *McNutt* is at odds with *Schweihs*, because it could be said that the device used in *Schweihs*, an ordinary amplifier, made the victim unaware it was being burglarized. Given the significant legitimate uses for the descramblers, we are not confident that the design of the descramblers places them into the narrow category of devices designed to be prohibited under section 2512(1)(b).

## V. CONCLUSION

Reasonable persons may disagree over the proper interpretation of section 2512(1)(b). But this very difficulty of interpretation is what has led us to disagree with our sister circuit. The government may not seek convictions under statutes that only arguably prohibit conduct. Appellants' convictions are therefore REVERSED.