PACIFIC & SOUTHERN CO., INC. and KPNX Broadcasting Co., Plaintiffs,

v.

SATELLITE BROADCAST NETWORKS, INC., Defendant.

NBC TELEVISION AFFILIATES, Plaintiff,

v.

SATELLITE BROADCAST NETWORKS, INC., Defendant.

NATIONAL BROADCASTING CO., Plaintiff,

v.

SATELLITE BROADCAST NETWORKS, INC., Defendant.

Nos. 1:87–CV–357–RHH, 1:87–CV–629–RHH and 1:87–CV–421–RHH.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 16, 1988.

Terrence B. Adamson, Dow Lohnes & Albertson, Atlanta, Ga., for plaintiffs.

David H. Flint, Alexander Jackson Simmons, Jr., Schreeder Wheeler & Flint, Atlanta, Ga., for defendant.

## ORDER

ROBERT H. HALL, District Judge.

Plaintiffs bring this consolidated action alleging defendant, by retransmitting the broadcast signals of television stations, is infringing plaintiffs' copyright in violation of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* and tortiously interfering with plaintiffs' contractual relations in violation of state law. Plaintiff Pacific & Southern Co., Inc. ("P & S") also alleges that defendant's actions constitute an infringement of P & S's service marks and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* Plaintiffs seek declaratory and injunctive relief as well as damages. This court's jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1338(a).

Currently before the court are plaintiffs' and defendant's cross-motions for partial summary judgment on the issue of liability. Also before the court is the motion of Satellite Broadcasting and Communications Association of America for leave to file an *amicus curiae* brief. At the outset, the court GRANTS the latter motion. The court read the *amicus* brief and considered the arguments in arriving at its conclusions enumerated below. For the reasons stated below, the court partially grants and partially denies both plaintiffs' and defendant's motions.[1]

FACTUAL BACKGROUND [2]

Plaintiff National Broadcasting Company, Inc. ("NBC") owns and operates the NBC Television Network, a national commercial television network with approximately 200 affiliated and 5 owned stations throughout the United States. Plaintiffs' Joint Statement of Material Facts as to Which There is no Genuine Issue, ¶ 1 ("Plaintiffs' Joint Facts"). Plaintiff P & S owns and operates WXIA–TV, a television station located in Atlanta, Georgia which is licensed by the Federal Communications Commission ("FCC") and affiliated with the NBC Television Network. *Id.,* ¶¶ 2–3. Plaintiff KPNX Broadcasting Company ("KPNX") owns and operates KPNX–TV which is broadcast in Mesa (Phoenix), Arizona and is affiliated with the NBC Television Network. *Id.,* ¶¶ 4–5. Plaintiff NBC Television Affiliates ("NBC Affiliates") is a corporation and trade association which represents the affiliated NBC network stations in legislative, administrative and judicial proceedings, and acts as a liaison between those stations and the NBC Television Network. *Id.,* ¶ 6. Defendant Satellite Broadcast Networks, Inc. ("SBN") is a Delaware corporation which receives the signals of three television stations

---

**1.** Because all the plaintiffs moved for summary judgment in their favor on the issues of defendant's alleged copyright infringement and tortious interference with contractual relations and because the grounds for their motions are identical, the court treats the three motions as one.

**2.** The court draws the factual summary from a compilation of plaintiffs' joint statement of material facts as to which there is no genuine issue, defendant's responses thereto and defendant's statement of material facts as to which there is no genuine issue to be tried.

owned by or affiliated with the three major television networks and retransmits (or makes secondary transmissions) of those signals via satellite. *Id.*, ¶ 7.

Some of the programs distributed by NBC for broadcast by the NBC network stations are created and produced by NBC itself. NBC is the copyright owner in these programs and, as such, owns the exclusive right to perform (i.e., broadcast) them. Other programs distributed by NBC to the NBC network stations include works that are produced by third parties and licensed on an exclusive basis to NBC for Network telecast. P & S, through its parent company, Gannett, is the beneficial owner of copyrights in programming it produces for broadcast by WXIA–TV. P & S also is the exclusive licensee of works produced by third-party producers and suppliers which have licensed P & S to broadcast such works in WXIA–TV's community of license. Both KPNX–TV and WXIA–TV have obtained the exclusive rights to broadcast some of the same programming in their respective communities of service. *Id.*, ¶¶ 8–12. The plaintiffs' exclusive rights as licensees and/or copyright owners are granted under and subject to the provisions of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

In 1986 defendant SBN introduced a service called "PrimeTime 24" which it described as a "special three-channel package of ABC, NBC and CBS broadcast superstations for the home satellite dish market." *Id.*, ¶ 26. From its facilities in Carteret, New Jersey, Atlanta, Georgia and Chicago, Illinois, SBN receives the over-the-air broadcast signals of WABC, WXIA and WBBM respectively. Defendant's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, ¶ 2 ("Defendant's Facts"). SBN then scrambles and uplinks those signals for satellite retransmission. The three signals are combined as a single three-channel package and retransmitted via satellite and small amounts of cable to home satellite dish ("HSD") owners throughout the United States who pay SBN an annual fee for the package. Plaintiffs' Joint Facts, ¶ 26.[3]

On December 11, 1986 SBN's retransmissions of the WXIA–TV broadcast signal became continuous and, except for several interruptions ranging in duration from one minute to four hours, the retransmissions have remained continuous to this date. *Id.*, ¶ 32. In April 1987, SBN began scrambling the retransmissions of WXIA–TV so that only HSD owners who have descramblers and who have been specifically authorized by SBN (and pay an annual fee to SBN) are able to receive the signal. *Id.*, ¶¶ 33–34; Defendant's Facts, ¶ 6. There are currently approximately 13,000 HSD owners who are paid subscribers to SBN's PrimeTime 24 service. At one time SBN predicted it would have 700,000 to one million subscribers by the year 1992. Plaintiffs' Joint Facts, ¶ 74.

SBN markets its PrimeTime 24 service to and serves HSD owners in the 48 contiguous states of the United States and Alaska, and the U.S. Trust Territories and possessions in the Caribbean. *Id.*, ¶¶ 63, 76. SBN is willing to sell and does sell its retransmissions to HSD owners residing in these areas regardless of whether they receive adequate over-the-air reception of an NBC network station or have access to a local cable system that carries the signals of a local NBC network station. SBN does not target its marketing efforts to HSD owners who reside in "white" areas (i.e., rural areas which cannot receive signals except via satellite) and indeed, some SBN subscribers reside in KPNX–TV's area of service (Phoenix) as well as in Atlanta, New York City, Los Angeles, Chicago, Philadelphia and Miami. *Id.*, ¶¶ 63–64.[4]

---

**3.** In addition to selling the PrimeTime 24 service to HSD owners, SBN, through a commonly owned corporation named PrimeTime Relay Corporation, allows cable systems to purchase the PrimeTime 24 Service. Plaintiffs' Joint Facts, ¶¶ 28–29. SBN also sells subscriptions to distributors of satellite dishes and descrambling equipment as well as satellite dish dealers who send the subscriptions to the ultimate subscribers. SBN has no contractual relationship with the ultimate subscriber. *Id.*, ¶¶ 70–71.

**4.** SBN does not specifically controvert these facts. Instead, SBN states that, although some of its viewers reside in urban areas, it believes its primary audience is rural.

SBN's satellite retransmissions of the WXIA–TV broadcast signal are delivered simultaneously throughout the entire geographic area reached by the satellite transmissions. Therefore, the SBN retransmissions frequently make Network programming available to viewers in the western parts of the nation at times different from the times such programming is broadcast to those viewers by the local NBC network stations. In addition, SBN's retransmissions of WXIA–TV's signal into the KPNX–TV area makes certain syndicated programming available in that area despite the fact that KPNX–TV has the exclusive right, subject to the Copyright Act of 1976, to display the syndicated programming. *Id.*, ¶¶ 57–58.[5]

In February 1987, plaintiffs P. & S, KPNX and NBC notified SBN in writing of their objections to SBN's retransmissions of the WXIA–TV signal and requested that SBN cease its retransmissions. At that time the three plaintiffs served upon SBN Advance Notices of Potential Infringement pursuant to section 411(b) of the Copyright Act of 1976. The Notices identified certain programs scheduled for broadcast and copyrighted by the plaintiffs and advised SBN that its unauthorized retransmission of the programs would constitute intentional copyright infringement. SBN subsequently retransmitted, without the consent of NBC or P & S, all of the works listed in the Notices of Potential Infringement. *Id.*, ¶¶ 35–38. In retransmitting the signals of WXIA–TV, SBN retransmits P & S's federally registered service marks "WXIA–TV" and "11–ALIVE" in interstate commerce. *Id.*, ¶¶ 19–21.

In early 1987, HSD viewers from approximately seven or eight states across the country as well as from parts of Georgia outside WXIA–TV's service area telephoned or wrote personnel at WXIA–TV blaming the latter (rather than SBN) for scrambling the WXIA–TV signal which they had previously received from satellite transmissions. In the first part of 1988, approximately ten to twelve HSD owners

from different parts of the country telephoned WXIA–TV (rather than SBN) inquiring how to receive WXIA–TV's signal on satellite in unscrambled form. *Id.*, ¶ 23. SBN has paid a total of $407.57 to the Copyright Office as royalty fees in connection with its retransmissions of the broadcast signals of WXIA–TV, WBBM–TV and WABC–TV. Aside from these payments to the Copyright Office, SBN intends to make no other payments to NBC, WXIA–TV or to any other copyright owners or licensees for the programming that it retransmits. *Id.*, ¶ 75.

SBN has neither requested nor received the consent of NBC, P & S or any NBC network station to retransmit or to market scrambled retransmissions of programming which is broadcast by WXIA–TV or any other NBC network station. SBN contends it is authorized to retransmit the WXIA–TV signal under the compulsory license provision of the Copyright Act of 1976, 17 U.S.C. § 111(c), and that it need not seek the consent of P & S or NBC. SBN does not deny that it retransmits the WXIA–TV signal without the plaintiffs' consent but it argues that it is not infringing the plaintiffs' copyright because the Copyright Act of 1976 entitles it to make such retransmissions. Further facts will be disclosed as necessary for discussion of the motion.

## DISCUSSION

All of the plaintiffs allege that defendant is infringing their copyright in violation of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and tortiously interfering with their network-affiliate contracts in violation of Georgia and Arizona state law. Plaintiff P & S further alleges that defendant is infringing its federally registered service marks and committing unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). The court will consider the three claims separately.

### I. *Copyright Infringement*

The Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, provides that the owner of copyright has the exclusive right to repro-

---

**5.** SBN's retransmissions also may provide different programming to communities (such as sports events) than was selected for viewing in those regions by the network. *Id.*, ¶ 59.

duce, distribute copies of, and publicly perform and display the copyrighted work. 17 U.S.C. § 106. Generally, therefore, the copyright holder has the exclusive right to decide who shall make use of his work and anyone desiring to reproduce, distribute or publicly perform or display the work must obtain the copyright holder's consent. The Copyright Act provides, however, a limited exception to the general rule of exclusivity. Section 111 of the Act limits a copyright holder's exclusive rights and provides that certain secondary transmissions of primary transmissions of a performance or display of a work do not constitute copyright infringement. In relevant part, section 111(c) provides that

> secondary transmissions to the public by a cable system of a primary transmission made by a broadcast station licensed by the Federal Communications Commission ... and embodying a performance or display of a work shall be subject to compulsory licensing upon compliance with the requirements of subsection (d) [pertaining to royalty fees] where the carriage of the signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

17 U.S.C. § 111(c). Thus, rather than requiring cable systems to individually negotiate with copyright holders, Congress has authorized cable systems, under a compulsory license scheme, to retransmit broadcast signals in exchange for the payment of a royalty fee which is distributed by the Copyright Office to the copyright owners.

Congress enacted the cable system compulsory license only after the Supreme Court had held that cable television's retransmissions of broadcast programming did not constitute "performances" under the copyright law and thus did not give rise to liability for infringement. *See Teleprompter Corp. v. Columbia Broadcasting System*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); *Fortnightly Corp. v.*

*United Artists Television*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). Congress was disturbed by these holdings because copyright owners were unable to share directly in the revenues gained by cable systems when the latter retransmitted copyrighted work to their subscribers. "Congress was of the view that the copyright holders should receive direct compensation for the use of their rights. But Congress also recognized that the transaction costs accompanying the usual scheme of private negotiation that controls the use of copyrighted material could be prohibitively high." *Cablevision Systems Development Co., v. Motion Picture Association of America, Inc.*, 836 F.2d 599, 602 (D.C.Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2901, 101 L.Ed.2d 934 (1988) (citing H.R.Rep. No. 1476, 94th Cong., 2d Sess. 89, U.S.Code Cong. & Admin.News 1976, p. 5659). After considering the issue and hearing from representatives of the television networks, their affiliates, cable systems as well as the FCC and the Office of Telecommunications Policy, Congress enacted the compulsory license provision of section 111(c).[6]

Both plaintiffs and defendant in the instant action cite the legislative history of the Act to support their cross-motions for summary judgment. Defendant argues that Congress intended the compulsory license provision to be flexibly interpreted to allow for new technology such as its satellite retransmissions. Plaintiffs contend that Congress did not contemplate including entities such as SBN in the definition of cable systems entitled to a compulsory license and that the licensing provision, which is an exception to the copyright owner's exclusive right to decide who may perform his work, must be construed narrowly. Even if no legislative history on the subject were available, however, the court believes the Act is unambiguous and that simple statutory interpretation indicates

---

**6.** One court noted that "There is of course a sense in which the Act is 'pro' copyright holder —it gave copyright owners protection against cable systems, which the Supreme Court had held the prior act did not." *WGN Continental Broadcasting Co. v. United Video*, 693 F.2d 622, 627 (7th Cir.1982).

that the cable system compulsory license provision does not apply to SBN.

■ As noted above, the Copyright Act of 1976 grants "cable systems" a compulsory license which allows them to retransmit primary transmissions of broadcasts free from liability for copyright infringement. The Act defines a "cable system" as

a facility, located in any State, Territory, trust Territory, or Possession, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, or other communications channels to subscribing members of the public who pay for such service.

17 U.S.C. § 111(f). SBN argues that it *has* "facilit[ies], located in any State [three states] ... that in whole or in part receive[] signals transmitted" by one or more television broadcast stations licensed by the FCC. Of course, Congress, unlike SBN, did not define a cable system as having more than one facility. And, although SBN argues that Congress did not specify that a cable system's facility must be located in one state only, the statute is clearly written in the singular rather than the plural. If Congress had wanted to define a cable system as an entity having facilities in any states, territories or possessions, it could have done so. Instead, Congress chose to define a cable system as *a* facility located in any state, territory *or* possession.

■ In addition, the clear language of the definition of a cable system requires the facility in any state to receive signals *and* make secondary transmissions of such signals by wires, cables, or other communications channels. SBN urges the court to interpret the Act by reading the single sentence in the statute as if it were a series of discrete and independent clauses. SBN argues that its earth facilities in New Jersey, Atlanta and Chicago "receive[] signals" and that its satellite, which makes secondary transmissions of such signals, constitutes "other communications chan-

nels" as allowed by the Act. This argument fails to recognize that the definition of cable system, a single unified sentence in the Act, requires the cable system to be a facility, located in any state, which makes secondary transmissions of signals. SBN's satellite which orbits the earth is not a facility located in any state.

SBN places much stock on the phrase, "other communications channels". The cases it cites to support its contention that Congress intended to include secondary transmissions by satellite in its definition of a cable system do not alter the plain meaning of the Act which defines a cable system in part as a facility in a state which makes secondary transmissions. The courts to which SBN refers did not interpret the meaning of section 111(f) and the definition of "cable system". Instead those courts considered the issue of whether the retransmission activity of a passive common carrier that retransmits signals to cable companies rather than the purchasing public is exempt from copyright infringement liability.

In *Eastern Microwave, Inc. v. Doubleday Sports, Inc.*, 691 F.2d 125 (2d Cir. 1982), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983), on which SBN relies at great length, the court held that the plaintiff's satellite retransmissions fell within the intent of the passive carrier exemption of the Act. The Second Circuit in *Eastern Microwave* noted with interest that Congress had commented that "carriers are exempt from copyright liability when retransmitting television signals *to cable systems* via terrestrial microwave or satellite facilities." *Id.* at 130 n. 11 (quoting H.R.Rep. No. 559, 97th Cong., 2d Sess. 4 (1982)) (emphasis added). This Congressional language and the *Eastern Microwave* court's holding regarding a satellite constituting "other communications channels" have no bearing on the issue before this court where the question is whether the definition of a "cable system" for purposes of the compulsory license provision can include an entity that uses three earth facilities and a satellite to retransmit broadcast signals to the public. The pas-

sive carrier exemption which the *Eastern Microwave* court construed makes no reference to "cable system" and therefore that court's holding is inapposite to this case. See, 17 U.S.C. § 111(a)(3) (passive carrier provision).[7]

The section of the Copyright Act which contains the compulsory license for cable systems is clear on its face and unambiguous. Although SBN attempts to make the Act unclear by changing Congress's use of the singular to the plural, the Congressional definition of "cable system" is clear on its face and does not include an entity that is comprised of three earth facilities and an orbiting satellite. "If the statute is clear on its face, [the court] need not examine additional sources of guidance." *Seaboard System Railroad v. Interstate Commerce Commission*, 827 F.2d 699, 701 (11th Cir.1987).[8]

■ Not only does the clear statutory definition of "cable system" fail to qualify an entity such as SBN for a compulsory license but SBN's activities may not benefit from the compulsory license because they do not meet the requirement that "the carriage of the signals comprising the secondary transmission [be] permissible under the rules, regulations, or authorizations of the Federal Communications Commission." 17 U.S.C. § 111(c). Although SBN argues

that it need not acquire affirmative authorization from the FCC, the plain meaning of "permissible" is "that may be permitted" and "permitted" means "consent[ed] to expressly or formally." Webster's Third New International Dictionary (unabridged) (1976). Indeed, the FCC, in discussing the exact issue before this court, noted that "the Commission has not declared in any affirmative fashion, through its 'rules, regulations or authorizations' that such distribution is permissible." *Inquiry into the Scrambling of Satellite Television Signals and Access to those Signals by Owners of Home Satellite Dish Antennas*, 2 FCC Rcd. 1669, 1698 n. 244 (1987).

Recognizing that it has not received express or formal permission from the FCC as required under the compulsory license provision of the Act, SBN argues that it is exempt from FCC regulation. This argument likewise fails. Although the FCC exempts from its cable system rules and regulations "a facility that services [sic] only to retransmit the television signals of one or more television broadcast stations," 47 C.F.R. § 76.5(a), the FCC has clarified that this exemption does not apply to entities such as SBN that retransmit "superstations".[9] SBN argues, however, that it is exempt because the FCC stated that facilities constructed after 1985 "and not meet-

---

7. SBN itself quoted language from hearings in the House of Representatives which undercuts its argument that Congress intended to include satellite retransmissions in its definition of "other communications channels". SBN cited the testimony of Barbara Ringer, the former Register of Copyrights, when she noted that secondary transmissions are carried out "usually by cable but sometimes other communication channels, like microwave and apparently laser beam transmissions that are on the drawing board if not in actual operation." Hearings on H.R. 2223 Before the Sumbcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 94th Cong. 1st Sess. 1828 (1975) (quoted in defendant's brief in support of motion for summary judgment, pp. 25–26). Although the Register provided two examples of "other communications channels" she did not refer to the use of satellite retransmissions.

8. Congress's unambiguous use of the singular to define a cable system as a facility located in any state that both receives signals and makes secondary transmissions is reinforced by the refer-

ence in other parts of the Copyright Act to the "local" nature of a cable system. See 17 U.S.C. § 111(f) (two or more cable systems in contiguous communities); 17 U.S.C. § 111(c)(4) (the community of the cable system); 17 U.S.C. § 111(e)(3) (in the area in which the cable system is located); and 17 U.S.C. § 111(f) (within whose local service area the cable system is located). In addition, the Copyright Royalty Tribunal Statement of Account form requires a description of a cable system's "community" as its area served.

9. The FCC stated "With respect to the status of 'superstations,' we believe that such signals which emanate well beyond the local viewing area should not be considered broadcast television signals for the limited purpose of the broadcast-only exclusion contained in the definition of a cable system." Implementation of the Provisions of the Cable Communications Policy Act of 1984, 50 Fed.Reg. 18640, 18641 (May 2, 1985).

ing the definition of a cable system contained in the Cable Act ... will no longer be subject to any signal carriage requirements." 50 Fed.Reg. 18640, 18641 (1985).

■ The flaw in SBN's argument is that it *does* meet the definition of a cable system contained in the Cable Act because it is a system which retransmits superstations "which the Congress clearly intended to include within the scope of the Cable Act's definition of a cable system." *Id.* It is apparent, therefore, that the FCC has neither exempted SBN from its rules, regulations or authorizations nor permitted the carriage of its secondary transmissions as required by the compulsory license provision of the Copyright Act.

The clear statutory definition of "cable system" contained in the Copyright Act indicates that SBN is not a cable system entitled to a compulsory license to retransmit broadcast signals free from copyright infringement liability. In addition, even if SBN could be construed as a "cable system" as that phrase is defined in the Act, it is not entitled to a compulsory license because its carriage of secondary transmissions is not permissible under the rules, regulations, or authorizations of the FCC. For these reasons, SBN, by retransmitting the broadcast signal of WXIA–TV is infringing plaintiffs' copyright.

II. *Tortious Interference with Contractual Relations*

Plaintiffs contend that SBN's retransmission of the WXIA–TV signal tortiously interferes with the contractual relations between the NBC Network and its affiliates who, by contract, are either granted the exclusive right or are given the right of first refusal to broadcast network programming in their area. SBN argues that plaintiffs' state law claims of tortious interference with contractual relations are expressly preempted by the Copyright Act of 1976. The court agrees with SBN and GRANTS its motion for partial summary judgment on the state law claim.

Section 301 of the Copyright Act provides in part that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301(a). The Eleventh Circuit has concluded that section 301 "in effect establishes a two-pronged test to be applied in preemption cases[:] ... whether the rights at issue fall within the 'subject matter of copyright' set forth in sections 102 and 103 and whether the rights at issue are 'equivalent to' the exclusive rights of section 106." *Crow v. Wainwright,* 720 F.2d 1224, 1226 (11th Cir. 1983), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 35 (1984). The parties in the instant case do not dispute that the rights at issue in plaintiffs' state law claim fall within the subject matter of copyright set forth in sections 102 and 103. They disagree, however, on whether plaintiffs' tortious interference with contractual relations claim is "equivalent to" the rights set forth in section 106.

The Eleventh Circuit has not addressed the question of whether the state law claim of tortious interference with contractual relations is preempted by the Copyright Act. The court did conclude, however, that the Florida criminal statute pertaining to dealing in stolen property was preempted and that section 301 prohibited Florida from prosecuting an individual under the state statute. In *Crow v. Wainwright* the court stated that the "proper method of analysis is to examine whether the elements of a cause of action for the tort of copyright infringement are equivalent to the elements" of the state law cause of action. *Id.,* 720 F.2d at 1226. The court concluded that the elements of the state cause of action in that case corresponded "almost exactly" to those of copyright infringement. The *Crow* court found that although the state cause of action "require[d] the prosecution to establish scienter, which is not an element of an infringement claim, ... [that] distinction alone does not render the elements of the crime different in a meaningful way." *Id.* The court reasoned that the state law cause of action

was preempted because "[t]he prohibited act—wrongfully distributing a copyrighted work—remains the same." *Id.*

Section 106 of the Copyright Act grants plaintiffs the exclusive right to perform and display (i.e., broadcast) their work publicly. The same is true with the network-affiliate contracts with which plaintiffs allege SBN is tortiously interfering. The elements of the state law tort of interference with contractual relations and copyright infringement are "almost exactly" the same. As was the case in *Crow*, the state law cause of action in the instant case, unlike a copyright infringement claim, requires proof of intent. This court believes, however, that, as in *Crow*, such a difference does not render the elements of the two causes of action different in a meaningful way.

■ Other courts have likewise held that the state law claim of tortious interference with contractual relations is preempted by section 301 of the Copyright Act. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 501 F.Supp. 848 (S.D.N.Y.1980), *aff'd,* 723 F.2d 195 (2d Cir.1983), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Motown Record Corp. v. George A. Hormel & Co.,* 657 F.Supp. 1236 (C.D.Cal.1987). In affirming the district court in *Harper & Row,* the Second Circuit stated

> In both [the copyright infringement and the interference with contractual relations claims], it is the act of unauthorized publication which causes the violation. The enjoyment of benefits from derivative use is so intimately bound up with the right itself that it could not possibly be deemed a separate element.... [T]he fact that cross-appellants pleaded addi-

tional elements of awareness and intentional interference, not part of a copyright infringement claim, goes merely to the scope of the right; it does not establish qualitatively different conduct on the part of the infringing party, nor a fundamental nonequivalence between the state and federal rights implicated.

723 F.2d at 201. This court is persuaded by the Second Circuit's reasoning and believes it comports with the Eleventh Circuit's holding in *Crow*. Therefore, the court finds that the plaintiffs' claims of tortious interference with contractual relations is preempted by section 301 of the Copyright Act and may not be heard by this court.

### III. *Violations of the Lanham Act*

In addition to claiming that SBN is infringing its copyright and tortiously interfering with its contractual relations with NBC, plaintiff P & S alleges that SBN is committing unfair competition and infringing its federally registered service marks, "WXIA–TV" and "11–ALIVE". P & S does not allege that SBN is violating state law but instead contends that, by retransmitting WXIA–TV's signal, including the registered service marks, SBN is violating sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a). Section 32(1) of the Lanham Act provides a remedy for anyone whose federally registered trade or service marks are infringed [10] and section 43(a) provides a remedy to anyone who is likely to be damaged by the false description of services by another person.[11] The legal standard for both claims under the Lanham Act is essentially the same. *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.,* 642

**10.** 15 U.S.C. § 1114(1) provides "any person who shall, without the consent of the registrant —(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant...."

**11.** 15 U.S.C. § 1125(a) provides that "any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, shall cause such goods or services to enter into commerce, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

**1574**

F.Supp. 1031, 1036 (N.D.Ga.1986) (Tidwell, J.).

To prevail on both Lanham Act claims, P & S must show that SBN used P & S's service mark in connection with the sale or distribution of services in interstate commerce, without P & S's consent, and in a manner likely to cause confusion as to the source or sponsorship of the services. *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). SBN does not contest P & S's showing that SBN has been using P & S's federally registered service marks in connection with the sale or distribution of services in interstate commerce without P & S's consent. SBN contends, however, that P & S's Lanham Act claims are preempted by the Copyright Act and that, even if not preempted, the question of likelihood of confusion may not be determined as a matter of law.

SBN's preemption argument is without merit. Section 301 of the Copyright Act only provides for the preemption of causes of action under the common law and statutes of any *state*. In addition, because the court has found, above, that SBN is not entitled to a compulsory license under section 111(c) of the Copyright Act, SBN's argument that Congress, through section 111(c), has authorized cable systems to retransmit the service marks of networks and their affiliates has no bearing on the issue of whether SBN is infringing P & S's service marks.

SBN also argues that P & S has not shown, as a matter of law, that SBN's use of P & S's registered service marks is likely to cause confusion as to the source or sponsorship of SBN's service. SBN points out that the question of likelihood of confusion is generally one of fact which turns on a number of elements including: the strength of the service mark, the similarity of design, the similarity of the product or service offered, the similarity of the purchasers, the defendant's intent and the actual confusion. *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir.1986). The Eleventh Circuit has held, however, that a finding that a defendant adopted a service mark with the intent of deriving benefit from the reputation of the plaintiff "may alone be enough to justify the inference that there is confusing similarity." *Id.* at 1542. In addition, the *Ambrit* court noted that "[a]ctual consumer confusion is the best evidence of likelihood of confusion." *Id.* at 1543.

SBN does not dispute that actual confusion as to the source of the satellite retransmissions of WXIA–TV has occurred among HSD owners. Nor does SBN dispute that it chose to retransmit the WXIA–TV signal in part because of the popularity of the syndicated programs broadcast by WXIA–TV and for the strength of WXIA–TV's coverage of local issues of interest in Atlanta and its perception that Atlanta is a "media center" or "capital of the south." Plaintiffs' Joint Facts, ¶¶ 23, 66, 67. Furthermore, in the instant case the design of the service mark is not only similar but *identical* and the similarity of the services offered by SBN and P & S as well as the purchasers of the services is undisputed.

SBN's use of P & S's actual service mark, as opposed to a similarly designed service mark, is much like a terminated franchisee's continued use of a franchisor's trademark. In such cases, courts have found that the franchisee's use of the trademark constitutes infringement as a matter of law. In *Burger King, supra,* the Eleventh Circuit cited a series of cases in which courts held that "continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement." 710 F.2d at 1493. In *Burger King* the court found that the franchisee's continued use of the franchisor's trademark without the franchisor's consent "was likely to cause confusion." The court therefore remanded the action for a determination of appropriate relief in conformity with the Lanham Act, 15 U.S.C. § 1117. *Id. See also, Prompt Electrical Supply Co., Inc. v. Allen–Bradley Co.*, 492 F.Supp. 344, 350 (E.D.N.Y.1980) (granted summary judgment on franchisor's trademark infringement counterclaim) (and cases cited therein).

Not only is SBN's use of P & S's actual service mark analogous to a terminated franchisee's use of a franchisor's trademark and thus, summary judgment is warranted, but another district court held in a case similar to the instant case that a defendant's use of plaintiffs' service marks via intercepted satellite cable programming constituted violations of sections 32(1) and 43(a) of the Lanham Act. In *Showtime/The Movie Channel, Inc. v. Covered Bridge Condominium Assoc., Inc.*, 693 F.Supp. 1080 (S.D.Fla.1988), the court found that defendants' use of plaintiffs' marks was likely to confuse, particularly in light of the fact that defendants were using the exact marks registered to plaintiffs. *Id.* at 1089. The court concluded that "as a matter of law, plaintiffs are entitled to a judgment of liability against defendants on both their claim for trademark infringement and their claim for unfair competition." *Id.* at 1090. Similarly, in the instant case, the court finds that, not only is there a likelihood of confusion, but SBN's unauthorized use of P & S's service marks has actually confused the public as to the source of the satellite retransmission. SBN's use of the identical service marks registered to P & S constitutes infringement and unfair competition in violation of sections 32(1) and 43(a) of the Lanham Act.

CONCLUSION

Defendant SBN is neither a "cable system" for purposes of the compulsory license provision of the Copyright Act nor is it permissibly retransmitting signals under the rules, regulations or authorizations of the FCC as required by the Act. Therefore, SBN's retransmissions of the WXIA–TV broadcast signal infringes plaintiffs' copyrights in violation of the Copyright Act of 1976. In addition, SBN's retransmission of P & S's federally registered service marks, "WXIA–TV" and "11–ALIVE" violates both sections 32(1) and 43(a) of the Lanham Act. Accordingly, the court GRANTS plaintiffs' motions for partial summary judgment on the issues of copyright and trademark infringement and unfair competition. The court finds that

plaintiffs' state law claims for tortious interference with contractual relations are preempted by section 301 of the Copyright Act and therefore GRANTS defendant's motion for partial summary judgment on plaintiffs' state law claim and hereby DISMISSES those claims. The court also GRANTS the motion of Satellite Broadcasting and Communications Association of America for leave to file an *amicus curiae* brief.