**C.B. FLEET COMPANY, INC., Plaintiff,**

v.

**COMPLETE PACKAGING CORPORATION d/b/a Chemical Packaging Corporation, Defendant.**

**No. 89 C 9467.**

United States District Court,
N.D. Illinois, E.D.

May 8, 1990.

---

John L. Alex, David Lesht, Charles C. Valauskas, Lockwood, Alex, Fitzgibbon & Cummings, Chicago, Ill., Peter S. Reichertz, John M. Packman, Arent, Fox, Kintner, Plotkin & Kahn, pro hac vice, Washington, D.C., for plaintiff.

David W. Gleicher, Douglas P. Roller, Karen E. Wilson, Rooks, Pitts and Poust, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case came before this court on C.B. Fleet Co., Inc.'s (Fleet's) motion for a preliminary injunction. This court conducted a hearing without a jury on the motion on January 26, January 31, and February 1, 1990. The court has heard the evidence and has considered the testimony, exhibits, memoranda of law, and arguments of counsel. Now fully advised in this matter, the full hearing having been concluded, the court makes the following findings:

1. Fleet is a corporation organized under the laws of the Commonwealth of Virginia, and has its principal place of business in Virginia.

2. Complete Packaging Corporation (CPC) is an Illinois corporation and has its principal place of business in Illinois.

3. The amount in controversy exceeds $50,000.

4. In addition to meeting the criteria for diversity jurisdiction in this court, Fleet has also alleged trademark infringement and unfair competition, trademark dilution, and breach of contract, in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) (1988).

5. Accordingly, the court has jurisdiction of this matter.

6. Venue is uncontested.

7. Fleet markets pharmaceutical and cosmetic products, including a variety of feminine hygiene products which it markets under the trademark "Summer's Eve". One of Fleet's "Summer's Eve" products is "Summer's Eve Feminine Powder".

8. This particular controversy is about the right to sell certain product labelled "Summer's Eve Feminine Powder", which CPC manufactured for Fleet.

9. Fleet contracted the production of Summer's Eve Feminine powder to CPC in early 1989.

10. In May, 1989, after entering the contract, Fleet registered the trademark

"Summer's Eve" for use on Summer's Eve Feminine Powder, Reg. No. 1,540,013.

11. Although the trademark for the powder wasn't registered until May, 1989, the Summer's Eve trademark has been in use on various feminine hygiene products since 1971.

12. In fact, Fleet has three different Federal registrations for use of the Summer's Eve trademark.

13. Fleet promotes its products by means of advertising on television and in magazines, newspapers, circulars, and other publications.

14. Since first using the Summers' Eve name on a product in 1971, Fleet has spent in excess of $100 million on advertising for all of the Summer's Eve line of products.

15. To ensure that its products contain the ingredients specified on their labels and that those products will perform adequately, Fleet has established certain quality control procedures.

16. Fleet itself produces certain of the products it markets, and it has certain other products produced for it pursuant to contract.

17. Fleet's quality control procedure for all products it markets, whether those products are produced by Fleet or production is contracted out to another company, includes chemical and microbiological testing of raw materials when they are received in the plant; "in-process analysis", which consists of similar tests on the product in its bulk stage, i.e. before packaging; and "finished product analysis", which consists of chemical and microbiological testing of the product after it has been packaged, but before shipment for sale to consumers.

18. Pursuant to its contract with Fleet, CPC was responsible for testing the chemical raw materials and packaging components for the powder. CPC was also responsible for performing the in-process testing on the product in bulk, before packaging.

19. Fleet itself tested the finished product, after it was packaged, but before it was shipped for final sale.

20. Fleet established the "quality control" procedure by which it conducted the testing of the finished product. Fleet's procedures were established before it entered into the contract with CPC, and required CPC to collect two finished bottles of the powder from the production line every half hour and mark them with the date and time. These samples were then sent to Fleet for finished product testing. After a period of time, Fleet and CPC agreed that samples should be collected every hour, rather than every half hour.

21. It took between two and a half and three hours to produce a batch of powder. Thus, by taking a sample every hour, CPC collected about three samples per batch, and the samples fairly represented the entire batch.

22. According to the results of all this testing, Fleet would accept or reject particular batches of product.

23. Through June, 1989, CPC followed the established procedure, and sent the samples to Fleet via an overnight courier service.

24. Fleet performed a variety of tests on the sample powder, including: a test to determine pH; a test to determine moistness; an assay of the benzethonium choloride ingredient; an assay for calcium, and a microbiological test to determine the bacterial and mold counts.

25. If the sample powder passed these tests, Fleet "approved" the batch. CPC would then ship the entire batch to Fleet, for "cosmetic" inspection, i.e. inspection to determine whether the outward appearance of the product was acceptable.

26. Fleet supplied all the ingredients for the powder to CPC, who processed the ingredients in order to make the final product, Summer's Eve Feminine Powder.

27. In early June, 1989, Fleet shipped *methyl* benzethonium chloride (MBC) to CPC, rather than the proper ingredient, benzethonium chloride. CPC was, at first, unaware of the problem, and processed fourteen batches of powder with the MBC.

28. CPC alerted Fleet when it discovered the problem.

29. After it became aware of the problem, Fleet requested that CPC segregate the batches contaminated with MBC (approximately 42,000 containers of powder), so that Fleet could destroy it.

30. CPC did not comply with Fleet's request. It did, however, ship one of the fourteen contaminated batches, No. SPR–395, to Fleet. CPC's record of this batch indicated that it contained benzethonium chloride; it was only after Fleet conducted its own tests that it discovered that the batch actually contained MBC.

31. Through the date of the hearing, CPC had not definitively informed either Fleet or this court of the exact location of the contaminated batches.[1]

32. Fleet has raised other complaints about CPC's manufacturing practices. On two occasions, the assays for certain batches of powder reflected improper levels of benzethonium chloride. On another occasion, two drums of an unrelated product, baby powder, were dumped into a hopper on the production line that CPC was using for Summer's Eve Feminine Powder.

33. Fleet had, at least once, accepted a batch after the assay reflected a low benzethonium chloride level.

34. Following the discovery of the MBC problem, CPC resumed production in late June, 1989. Fleet concurrently began collecting for itself the product samples for its quality control testing. In order to obtain product samples which were representative of the entire batch, Fleet collected one case from each of the three pallets which comprised a batch shipped by CPC to Fleet, and chemically tested two bottles from each of the three cases.

35. Fleet collected a second case from each of the three pallets for its cosmetic inspection.

36. Fleet followed this sampling procedure for the next fifty-two batches.

37. Fleet approved the *contents* of each of those batches, but five of them failed Fleet's cosmetic inspection.

38. Fleet is seeking a preliminary injunction against the sale of the last 38 batches of powder which CPC produced. The batches consist of about 11,645 cases, or 139,740 individual packages of powder. Fleet purchased the ingredients and packaging components for these batches for $41,000, and provided them to CPC.

39. In September, 1989, a dispute arose between Fleet and CPC about the cost of the 38 batches.

40. After various discussions, and a visit by Mr. Hricz, Fleet's Vice President of Operations, to CPC, the parties reached an agreement, which was memorialized in a letter sent by Mr. Hricz to Mr. Tom Conwell, CPC's president on September 21, 1989.

41. The letter states that "preshipment samples for each batch … must be sent to [Fleet] for Quality Assurance testing and release." The letter does not specify the number of samples to be sent, nor how they are to be collected.

42. Elliott Weller, CPC's Vice President of Finance, understood the agreement to mean that CPC should send one case per batch to Fleet, so that Fleet could perform whatever quality control tests were necessary to approve the entire batch. Mr. Conwell, who actually entered the agreement with Fleet, did not testify.

43. Neither the letter nor the testimony of the witnesses is conclusive as to the type or quantity of pre-shipment samples which CPC was to ship to Fleet for testing.

44. In fact, CPC sent one case per batch to Fleet for testing.

45. Whereas with its prior sampling procedure, Fleet was able to test samples produced at a variety of times and thus representative of the entire batch, the new procedure provided a sample of only a small portion of the batch, with each con-

---

1. Mr. Weller, CPC's Vice President of Finance, testified that "to the best of [his] knowledge", the contaminated batches were segregated from accepted or finished products. Transcript of Hearing, January 31, 1990, p. 158.

tainer of powder produced at nearly the same time.

46. Fleet performed chemical testing, but did not make a cosmetic inspection of those samples.

47. Whatever the parties understood as to pre-shipment testing, the parties did agree that CPC was to ship all the product to Fleet before it was distributed for sale to consumers.

48. Fleet will not approve the final 38 batches until it has determined that all fourteen batches contaminated with MBC have been accounted for and have not been mixed with subsequent batches.

49. Once it had satisfied itself that none of the remaining 38 batches is contaminated with MBC, Fleet intended to perform the same testing procedures it had performed on prior batches.

50. The "testing" issue was never resolved, and a chattel lien was eventually placed on the 38 batches of powder.

51. Despite Fleet's attempts to block it, a Sheriff's sale was held on December 26, 1989. CPC purchased all 38 batches at the sale for $25,000.

52. Although Fleet did send a representative to the sale, the representative was not authorized to bid more than $25,000.

53. At no time prior to January, 1990, did Fleet raise the question of trademark infringement.

## CONCLUSIONS OF LAW

The standard for issuing a preliminary injunction in this circuit is clear. The plaintiff must show:

1. that it has no adequate remedy at law;

2. that it will suffer irreparable harm if the preliminary injunction is not issued;

3. that the irreparable harm it will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;

4. that it has a reasonable likelihood of prevailing on the merits; and

5. that the injunction will not harm the public interest.

*International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988).

■ These factors must be analyzed according to a "sliding scale" approach. *Illinois Psychological Association v. Falk*, 818 F.2d 1337, 1340 (7th Cir.1987). Thus, even where the plaintiff has a less than 50% chance of winning on the merits, it may still merit a preliminary injunction if it is able to demonstrate that the harm to it should the injunction not issue will be far greater than the harm to the defendant should the court enter the injunction. *Id.*, citing *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir.1984). In other words, "the degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor." *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir.1986). This court will consider each of these factors in turn.

### 1. Adequate Remedy at Law and Irreparable Harm

■ The first two requirements for a preliminary injunction are most efficiently discussed together. Fleet claims that if CPC is allowed to sell the powder, and if any of the powder is adulterated, or any of the containers cosmetically damaged, Fleet's reputation could be irreparably harmed. While of course the same would happen if Fleet itself released damaged product, in this case, Fleet has no opportunity to inspect the goods which will bear its name before they are released for sale by CPC.

The Seventh Circuit has held that a significant consideration in the balance of harms is whether the defendant's actions deprive the plaintiff of control over its reputation. *International Kennel Club*, 846 F.2d at 1091–92. Here, Fleet argues that its reputation is embodied in the Summer's Eve trademark. That trademark is on the containers of powder at issue. The powder is in the hands of CPC, whose business

relationship with Fleet has completely deteriorated. Fleet no longer has any control over the powder, yet the powder bears its trademark. Thus, it implicates Fleet's reputation. Harm to reputation cannot be adequately remedied at law. Accordingly, Fleet has met the first standard for issuance of a preliminary injunction.

### 2. Balance of Harms

The fact that Fleet could be irreparably harmed if this court does not issue the injunction does not end the inquiry. The court must also look to the damages which CPC would likely suffer if this court grants the injunction.

CPC does not, and as far as this court can discern, cannot, allege that it will suffer anything other than financial harm should this court issue a preliminary injunction in favor of Fleet. That harm can be secured against by a bond posted by Fleet, and is thus not irreparable.

### 3. Likelihood of Prevailing on the Merits

Fleet must also demonstrate to this court that it is likely to prevail on the merits. Fleet has met this burden. Fleet has presented a variety of legal arguments, pursuant to any one of which it argues that it would prevail. Because this court finds that Fleet is likely to prevail on its trademark infringement claim, it will not address the remainder of Fleet's arguments.

Fleet's right to the injunction it has requested hinges on the validity of its argument that, as a trademark owner, it has the right to control the quality of goods bearing its trademark. Under this analysis, the question whether the goods are in fact defective is irrelevant. The only relevant inquiry is whether the trademark owner is able to adequately supervise the production (and therefore the quality) of its goods before they are released to the public, putting the owner's reputation in jeopardy.

The Second Circuit has endorsed this view of a trademark owner's rights, in *El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986). El Greco, the plaintiff in the case, owned a trademark for a particular type of shoe.

It, like Fleet, contracted out the production of its product. Also like Fleet, El Greco became dissatisfied with its contractor. The contract was cancelled after the contractor completed production on the final two lots of shoes, and affixed the trademark, but before El Greco had inspected or approved them. The contractor sold the shoes to a retail distributor, and the plaintiff sought to enjoin the sale of the uninspected shoes.

The Second Circuit held that even if the quality of the goods had not been an issue during the contractual relationship, inspection was an "integral part of El Greco's procedure for determining whether to accept shoes and allow them to be sold under its trademark." *Id.* at 395. That being the case, the shoes were not "genuine" for purposes of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). That section provides:

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods or services on or in connection with which such use is likely to cause confusion.... shall be liable in a civil action by the registrant....

Since El Greco had never consented to the use of its trademark on the remaining shoes, the court held that it was entitled to assert its right as owner of the trademark to bar the sale of the shoes. This was true even though "El Greco did not, at the time it cancelled the last two lots of its order, give instructions on how to dispose of the shoes that had already been manufactured and affixed with the ... trademark." *El Greco*, 806 F.2d at 396. Rather, "[o]nce it cancelled the order, El Greco was entitled to assume that [the contractor] would not dispose of the shoes without either removing the ... trademark ... or affording El Greco an opportunity to inspect the goods and certify their quality prior to disposal, or, at the minimum, seeking instructions from El Greco on how to dispose of them." *Id.*

The Seventh Circuit has not confronted this particular question head-on. It has, however, stated that the *El Greco* decision, as well as an Eleventh Circuit decision and various district court decisions which reached the same conclusion were "sensible". *General Electric Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir.1989), citing *Burger–King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir.1983), *Mobil Oil Corp. v. Auto–Brite Car Wash, Inc.*, 615 F.Supp. 628, 631 (D.Mass.1984), *Pacific & Southern Co. v. Satellite Broadcast Networks, Inc.*, 694 F.Supp. 1565, 1573–75 (N.D.Ga. 1988).

 This court, too, finds the *El Greco* decision to be 'sensible'. Furthermore, there is no evidence (despite CPC's arguments to the contrary) that Fleet waived its rights under its trademark with respect to the final 38 batches.[2] Without making the ultimate decision whether Fleet *will* prevail on the merits, this court finds that Fleet has a strong likelihood of prevailing.

*4. Public Interest*

██ Fleet argues that the public interest will be served by the grant of a preliminary injunction because consumers have a right to know what it is they are purchasing. If this court does not grant the injunction, then consumers will buy goods with Fleet's trademark on them, but which have not been subjected to the same quality control measures which Fleet normally takes. This is enough to show that the public interest would be served by the issuance of a preliminary injunction. *International Kennel*, 846 F.2d at 1092; *A.J. Canfield v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir.1986).

## CONCLUSION

Fleet has satisfied each of the requirements for the issuance of a preliminary injunction. Accordingly, this court grants Fleet's motion for a preliminary injunction and orders that:

1. The injunction shall be in force during the pendency of this action.

2. Until that time, CPC and all of its subsidiaries, officers, agents, employees, and attorneys, and all persons in active concert or participation with any or all of them are preliminarily enjoined and required to;

 a. refrain from selling, offering for sale, or distributing any of the approximately 11,645 cases of Summer's Eve Feminine Powder in CPC's possession, unless they first remove the Summer's Eve trademarks,

 b. notify each person or entity to which they have already sold any of the goods in question of this order, and immediately recall those goods from the purchasers,

 c. file with the court and serve on Fleet within 10 days after service on CPC of this order a report in writing and under oath setting forth in detail the manner in which CPC has complied with this order.

Bond is hereby fixed in the amount of fifty thousand dollars ($50,000).

---

**2.** CPC relies on the facts that Fleet did not bid for the powder at the Sheriff's sale, and that it did not raise the trademark infringement problem until sometime after the Sheriff's sale. While these facts do not speak well for Fleet's diligence, they do not rise to the level of waiver. Fleet could not be required to pay CPC for Fleet's right to assert its trademark rights, nor was Fleet required to raise the trademark issue until it became apparent that CPC intended to sell the goods under Fleet's trademark. The parties were in an active dispute prior to the time that Fleet raised the trademark issue. Thus, CPC was not "lulled ... into a false sense of security...." See *Helene Curtis Ind. v. Church and Dwight Co.*, 560 F.2d 1325, 1334 (7th Cir.1977) (citation omitted).